# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| JOHN MASCARO, | ) | CASE NO. 1:16CV0436 |
| | ) | |
| Plaintiff, | ) | JUDGE DAN AARON POLSTER |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, John Mascaro ("Plaintiff"), challenges the final decision of Defendant, Carolyn

W. Colvin, Acting Commissioner of Social Security ("Commissioner"), denying her applications

for Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under

Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").

This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned

United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for

preparation of a Report and Recommendation.  For the reasons set forth below, the Magistrate

Judge recommends that the Commissioner's final decision be VACATED and this matter

REMANDED for further proceedings consistent with this Report and Recommendation.

## I.  PROCEDURAL HISTORY

On July 12, 2012, Plaintiff filed applications for DIB and SSI alleging a disability onset date of June 7, 2011 and claiming he was disabled due to pain/spasms in lower back, upper shoulder, neck, knees, and legs; carpal tunnel, offset hip, and snapped tendon in right arm. (Transcript ("Tr.") 102-103, 313, 317).  The applications were denied initially and upon reconsideration, and Plaintiff requested a hearing before an administrative law judge ("ALJ"). (Tr. 164, 173, 182, 189, 196).

On February 24, 2014, the ALJ held a hearing, during which Plaintiff, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 52).  On March 25, 2014, the ALJ issued a written decision finding Plaintiff was not disabled.  (Tr. 142-151).  The ALJ determined that Plaintiff was able to perform a range of light work, and, although he could not perform past relevant work, he could, given his vocational profile, perform other work in the economy.  (Tr. 147-150).

Plaintiff requested review of the ALJ's decision.  (Tr. 235-36).  On October 3, 2014, the Appeals Council vacated the ALJ's decision.  The Appeals Council determined that the ALJ's decision did not contain an adequate evaluation of the opinion of Plaintiff's treating source or his physical therapist; and that the ALJ did not properly evaluate Plaintiff's credibility.  (Tr. 158). The Appeals Council remanded the case with instructions that the ALJ obtain additional evidence, further evaluate Plaintiff's subjective complaints, and give further consideration to Plaintiff's maximum residual functional capacity.  (Tr. 159).

On remand, the case was assigned to a new ALJ.  A new hearing date was set for April 7, 2015, and Plaintiff, medical expert Dr. Malcolm Barnes, and a vocational expert were scheduled

to testify.  (Tr. 242, 244, 246-247, 286).  Plaintiff and the VE ultimately testified, but the medical

expert did not, as the ALJ decided not to use him.  (Tr. 78).

On June 16, 2015, the ALJ issued a written decision finding that Plaintiff was not

disabled.  (Tr. 33-43).  The ALJ' s decision became final on January 27, 2016, when the Appeals

Council declined further review.  (Tr. 1-6).

On February 25, 2016, Plaintiff filed his complaint to challenge the Commissioner's final

decision.  (Doc. No. 1).  The parties have completed briefing in this case.  (Doc. Nos. 12, 13).

Plaintiff asserts the following assignments of error:

> (1)  Whether the ALJ erred in the weight assigned to the opinion of Plaintiff's
> treating rheumatologist, and in his finding that the Plaintiff could perform more
> than sedentary activity;

> (2)  whether the ALJ's assessment of Plaintiff's upper extremity limitations was
> legally insufficient and contrary to evidence of Plaintiff's disability;

> (3) Whether the ALJ's determination that Plaintiff does not have a severe mental
> impairment lacks the support of substantial evidence and requires remand.

(Doc. No. 12 at 1).

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Plaintiff was born February 4, 1960 and was fifty-five (55) years-old at the time of his

administrative hearing.  (Tr. 79, 102).  He has a high school education, and he has past relevant

work as a landscaping laborer and as a stock clerk.  (Tr. 59, 349).

**B.     Medical Evidence**

On May 30, 3012, Plaintiff was treated at the Cleveland Clinic.  (Tr. 417).  Plaintiff complained of lower and mid-back pain that had been worsening over the past three years.  (*Id.*). The pain was described as dull, achy, non-radiating, worse with movement but otherwise constant.  (*Id.*).  Plaintiff further complained of right shoulder pain worsening over the previous fifteen years, right arm pain, and bilateral knee pain.  (*Id.*).  On examination, Plaintiff exhibited no pain with palpation of vertebrae, normal spine range of motion, normal motor strength and sensation, negative straight leg raise, positive tender points, lower extremity edema, and positive findings of right shoulder pain and stiffness.  (Tr. 418-19).  The primary diagnosis was lumbago. Other diagnoses included obesity, elevated blood pressure, bilateral shoulder pain, fibromyalgia, bilateral leg edema, GERD, and stress.  (Tr. 420).

On June 5, 2012, an x-ray of Plaintiff's shoulders was normal, as was a June 14, 2012 echocardiogram.  (Tr. 427-28).  On June 21, 2012, Plaintiff was again treated at the Cleveland Clinic.  (Tr. 436).  Plaintiff complained of back pain and reported an inability to work due to musculoskeletal issues.  On examination, Plaintiff exhibited no pain to palpation of spine, normal motor and sensory functioning, muscle spasm around the mid-back, and a normal gait. (Tr. 438).  His physician advised that Plaintiff had a good chance of improvement with weight loss and physical therapy.  (Tr. 436).

In June and July 2012, Plaintiff attended physical therapy sessions.  (Tr. 445-466). Plaintiff's attention and attitude were good.  (Tr. 447).  Initial examination revealed spine pain, antalgic gait, decreased stride length bilaterally, decreased arm swing, guarding of both knees, shoulder pain, an inability to keep the right arm in flexion or bear weight, and an apparent right

4

biceps tear with a popeye deformity.  (Tr. 447-448).  The physical therapist noted tight hamstrings and gastrocs, a large abdomen with postural asymmetry, resticted trunk flexion and left side bending, and myofascial restrictions.  (Tr. 449).  On July 24, 2012, Plaintiff reported severe pain.  He reported being limited to sitting thirty (30) minutes at a time, standing ten (10) minutes at a time, and sleeping less than four (4) hours.  (Tr. 464-465).  However, physical therapy services were discontinued at that time as Plaintiff had been non-compliant.  (Tr. 465).

On September 12, 2012, a state agency physician, Lynne Torello, M.D., reviewed Plaintiff's medical records and determined that Plaintiff could lift twenty (20) pounds occasionally, ten (10) pounds frequently, stand and/or walk six (6) hours in an 8-hour workday, occasionally climb, stoop, and crawl, and occasionally reach overhead.  (Tr. 107-108).

On November 2, 2012, Plaintiff was seen by rheumatologist Howard Smith, M.D., for a disability evaluation.  (Tr. 538).  Plaintiff complained of back and arm pain which had been ongoing for about four years, and he indicated that his back pain was worse at the end of the day.  (Tr. 539).  Plaintiff complained of shoulder and knee pain as well.  (*Id.*).  On examination, Plaintiff exhibited diffuse tenderness of the cervical spine and paraspinous muscle areas but was otherwise normal for palpation and percussion.  (Tr. 540).  His gait was antalgic due to his weight; range of motion showed limited flexion, extension, rotation, and lateral bending.  (*Id.*).  Straight leg raising was negative bilaterally.  (*Id.*).  Plaintiff was able to stand on heels and toes, and his motor strength was within normal limits.  (*Id.*).  Plaintiff exhibited a mild decreased range of motion of both shoulders with diffuse tenderness.  (*Id.*).

On November 8, 2012, Plaintiff was evaluated for physical therapy.  (Tr. 526).  Plaintiff complained that he was only able to walk for a couple minutes before he experienced back

5

spasms, and which point he stops, rests, bends over, and stretches his back.  (Tr. 532).  Plaintiff reported that he has to take multiple breaks when doing yard work; and that a job that should only forty-five minutes now takes him all day to complete.  (*Id.*).  On examination, Plaintiff had diffuse tenderness to his lumbar spine, an antalgic gait due to his weight, normal motor strength, a mild decrease in shoulder range of motion, and normal examination of the extremities with no swelling or tenderness.  (Tr. 528).

On November 12, 2012, Plaintiff participated in physical therapy.  (Tr. 535-536).  Plaintiff reported a pain score of ten on a scale of ten, with pain across his low back and shoulders.  (Tr. 535).  The therapist noted Plaintiff transferred sitting to standing and on and off the mat table easily and independently.  (*Id.*).  Plaintiff ambulated independently without device and with good gait pattern.  (*Id.*).  The therapist observed that Plaintiff "appears to move more easily than reported pain level (10/10) would allow."  (Tr. 536).

On November 13, 2012, Plaintiff presented to Michael Koniarczyk, M.D., for a comprehensive problem evaluation and to establish care.  (Tr. 544).  Plaintiff complained of difficulty sitting or standing in the same position for longer than ten (10) minutes.  (*Id.*).  Dr. Koniarczyk noted Plaintiff had not had a physical or a primary care physician in twenty-five (25) years.  (*Id.*).  The doctor indicated Plaintiff had been referred to a dietician and bariatric center but that Plaintiff was not interested in bariatric surgery because his diet was limited to church donations.  (*Id.*).  On examination, Plaintiff exhibited full range of motion in the neck, normal curvature of the spine, normal range of motion, tenderness to palpation across the back, and normal gait.  (Tr. 545-546).  Dr. Koniarczyk diagnosed fibromyalgia, GERD, morbid obesity, chronic shoulder pain, and lumbago.  (Tr. 546).

On December 3, 2012, Plaintiff was seen at the Cleveland Clinic for a functional capacity evaluation.  (Tr. 565-573).  He exhibited an "extremely severe level of depression and severe level of anxiety," as reflected on the Depression, Anxiety, Self Scale (DASS).  (Tr. 565). Plaintiff tolerated sitting for twenty-three (23) minutes, standing for ten (10) minutes, walking for six (6) minutes, and standing/walking for twenty-two (22) minutes.  (Tr. 569).  The evaluator placed Plaintiff at a sedentary physical demand level.  (Tr. 565).

On December 4, 2012, a state agency physician reviewed Plaintiff's records as of November 27, 2012 and determined that Plaintiff could perform light work with occasional overhead reaching bilaterally.  (Tr. 128-129).

On December 21, 2012, Plaintiff was seen by Dr. Smith, whose assessments of Plaintiff included lumbago, chronic low back pain, chronic shoulder pain, fibromyalgia, bilateral leg edema, and elevated blood pressure.  (Tr. 551).  Plaintiff's fibromyalgia was "stable."  (*Id.*).  On examination, Dr. Smith noted diffuse tenderness of the cervical spine and paraspinous muscle areas, which was otherwise normal for palpation and percussion.  (Tr. 552).  Dr. Smith noted a mild decrease in cervical range of motion.  (*Id.*).  Also noted was diffuse tenderness of the lumbar spine and paraspinous muscle areas which was otherwise normal for palpation and percussion.  (Tr. 553).  Plaintiff's gait was antalgic due to his weight.  (*Id.*).  Range of motion of lumbosacral spine showed limited flexion, extension, rotation, and lateral bending.  (*Id.*). Plaintiff's straight leg raising was negative bilaterally.  (*Id.*).  Both shoulders showed a mildly decreased range of motion with diffuse tenderness.  (*Id.*).  Dr. Smith noted there was no soft tissue swelling; no joint instability, subluxation, misalignment, or laxity.  (*Id.*).  Plaintiff had intact memory and appropriate mood, affect, judgment, and insight.  (Tr. 552).

7

On March 23, 2013, Dr. Smith again noted that Plaintiff's conditions were stable.  (Tr. 591).  Physical examination findings were unchanged from the previous visit.  (*Id.*).

On June 30, 2013, Plaintiff was seen by Dr. Smith.  Plaintiff reported that he was "much better," although he reported diffuse aches and pains but less than previously.  (Tr. 598).  Dr. Smith again noted that Plaintiff was stable with respect to his chronic shoulder pain, chronic back pain, and fibromyalgia.  (*Id.*).  Dr. Smith again noted diffuse tenderness of the muscle and joints and antalgic gait.  (Tr. 599).

On December 26, 2013, Dr. Smith observed Plaintiff was stable as to his bilateral knee pain, chronic shoulder pain, and fibromyalgia.  (Tr. 611).  It was noted Plaintiff was doing well with Cymbalta, and his pain had decreased.  (*Id.*).  Physical examination revealed diffuse tenderness of the muscle and joints in the fibromyalgia tender points with no swelling, erythema, or effusions; diffuse tenderness in the paraspinous areas of the lumbosacral spine; and antalgic gait due to Plaintiff's weight.  (Tr. 613).

On March 28, 2014, Dr. Smith completed a form certifying that Plaintiff had a medically determinable physical impairment.  (Tr. 619).  Specifically, Dr. Smith stated that Plaintiff had bilateral knee pain, shoulder pain, low back pain, fibromyalgia, and morbid obesity.  Dr. Smith indicated that "due to several areas of joint pain, he is moderately-severely disabled."  Dr. Smith identified severe limitations with sitting, standing, walking, and lifting; moderate limitations on activities of daily living; and moderate limitations as to residual functionality.  (*Id.*).

On April 26, 2014, Plaintiff presented to Dr. Smith.  (Tr. 622).  Dr. Smith noted "patient is stable."  (*Id.*).  Plaintiff was given instructions to use of medications as ordered.  (*Id.*).  Dr. Smith recommended intermittent rest, a back care exercise program, and weight loss, and he

8

noted that Plaintiff had improved on Cymbalta.  (*Id.*).  Plaintiff was administered an injection in his shoulder.  (*Id.*).  Physical examination again revealed tenderness in shoulders with a decreased range of motion; diffuse tenderness in his lumbosacral spine, but otherwise no joint or muscle tenderness.  (Tr. 624).  His neurologic exam was grossly intact, and his extremities were normal with full range of motion an no joint instability.  (Tr. 622).

On April 30, 2014, Plaintiff was seen by a urologist, and he was diagnosed with micro hematuria.  (Tr. 633-35).

On September 17, 2014, Plaintiff was seen by Joseph Rock, Ph.D., for an initial psychological evaluation.  (Tr. 641-642).  Plaintiff complained of anxiety and depression.  He reported recent deaths in his family and a troubled financial situation due to a divorce.  (Tr. 642).  A mental status examination revealed that plaintiff had become anxious, depressed, and irritable secondary to physical, situational, and financial stressors.  Dr. Rock diagnosed plaintiff with an anxiety disorder not otherwise specified and a mood disorder not otherwise specified. (Tr. 643).  Plaintiff was assigned a Global Assessment Functioning ("GAF") score of 51-60 indicating moderate symptoms or moderate difficulty in social, occupational, or school functioning.  (*Id.*).

On October 2, 2014, Plaintiff was seen by Dr. Smith, who administered injections in both his shoulders.  (Tr. 696).  On examination, Dr. Smith observed intact memory and appropriate mood, affect, judgment, and insight.  (Tr. 698).  Dr. Smith also noted diffuse tenderness in the shoulders with decreased range of motion, but otherwise no joint or muscle tenderness, normal extremities with full range of motion and no crepitation, no joint instability, and normal muscle strength and tone.  (*Id.*).

9

Plaintiff was again seen by Dr. Rock on October 8, 2014, December 9, 2014, and January 9, 2015.  (Tr. 646, 652, 655).  Plaintiff remained depressed, frustrated, and irritable (Tr. 646), and he complained of financial problems and difficulties with his wife. (Tr. 655).  On mental status examination, Plaintiff exhibited appropriate behavior, depressed or angry mood, appropriate and full affect, appropriate insight and judgment, and intact and linear associations. (Tr. 646, 652, 655, 715, 718, 721, 724).

On January 20, 2015, Dr. Rock completed a medical source statement which rated Plaintiff's mental capacity.  (Tr. 704).  With respect to making occupational adjustments, Dr. Rock concluded that Plaintiff could frequently follow work rules; occasionally use judgment; rarely maintain attention and concentration for extended periods of two (2) hour segments; rarely respond appropriately to changes in routine settings; occasionally maintain regular attendance and be punctual within customary tolerance; rarely deal with the public, relate to co-workers, or interact with supervisors; occasionally function independently without redirection; rarely work in coordination with or proximity to others without being distracted by others; occasionally work in coordination with others without being distracting to others; rarely deal with work stress; rarely complete a normal workday and workweek without interruption from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods.  (*Id.*).

With respect to intellectual functioning, Dr. Rock opined that Plaintiff could rarely understand, remember, and carry out complex job instructions; rarely understand, remember and carry out detailed, but not complex job instructions; and occasionally understand, remember, and carry out simple job instructions.  (Tr. 705).  As to making personal and social adjustment, Dr.

Rock found that Plaintiff could occasionally maintain appearance; occasionally socialize, rarely behave in an emotionally stable manner; rarely relate predictably in social situations; frequently manage funds/schedules; and constantly have the ability to leave his home on his own.  (*Id.*).

In support of his assessments, Dr. Rock noted that Plaintiff suffers from anxiety disorder and depressive disorder; his symptoms include anxiety, depressed mood, poor concentration, and short-term memory, obsessive worry, insomnia, and anger.  (*Id.*).

On February 4, 2015, Plaintiff was seen by Dr. Rock, who reported Plaintiff had been doing a better job at managing conflict with his wife.  (Tr. 718).  However, Dr. Rock reported that Plaintiff had gotten into an argument with his wife just prior to his appointment because he was in pain and was rushing to his appointment.  (*Id.*).

On February 5, 2015, Dr. Smith completed a medical source statement.  (Tr. 669).  Dr. Smith opined that Plaintiff was capable of lifting/carrying no more than five (5) pounds either occasionally or frequently; and standing, walking, or sitting no more than one (1) hour in an eight-hour workday.  Dr. Smith also noted Plaintiff could rarely climb, balance, stoop, crouch, or kneel; and rarely reach, push or pull, or engage in fine or gross manipulation.  (Tr. 670).  Dr. Smith opined that Plaintiff suffers from moderate to severe pain.  (*Id.*).  Dr. Smith noted that Plaintiff's pain was increased because he was no longer eligible to obtain Cymbalta through a patient assistance program.  (Tr. 671).

On February 18 and March 6, 2015, Plaintiff was seen by Dr. Rock, who reported that Plaintiff was still depressed, his thinking remained pessimistic, and he was more anxious and obsessive.  (Tr. 721, 724).

11

On July 16, 2015, Plaintiff followed up with Dr. Smith for osteoarthritis, fibromyalgia, and depression.  (Tr. 732).  Dr. Smith noted that Plaintiff had insurance and that he was taking Cymbalta again.  (*Id.*).

**D.      Hearing Testimony**

During the first hearing on February 24, 2014, Plaintiff testified to the following:

- He had worked in the family landscaping business since he was eight (8) years old, but he had to stop because he could no longer kneel, lift, push mowers, and stand on his feet for a long time.  (Tr. 61).

- At the time of the hearing, he was able to stand for about ten (10) or fifteen (15) minutes before have to take a break.  (Tr. 62).

- He could sit for about fifteen (15) minutes before having to stand up and crack his back.  (Tr. 62).

- He could lift only five to six pounds and had trouble using his hands.  (Tr. 63-64).

During the second hearing on April 7, 2015, Plaintiff testified to the following:

- He suffered from neck, back, shoulder, knee, hand, and fibromyalgia pain.  (Tr. 79).

- Plaintiff was using a rolling walker at the time of the hearing, which was prescribed by his doctor.  (Tr. 80).

- Plaintiff spent his day lying on the couch, sitting in a chair, and walking a little. (Tr. 81).  Plaintiff stopped working because of the pain.  (Tr. 82).

The VE testified Plaintiff had past work as a supervisor of landscaping (light and skilled), laborer landscaping (heavy and unskilled), business owner (light, skilled), and as a stock clerk (heavy and semiskilled).  (Tr. 84-85).

12

The ALJ described the first hypothetical worker as follows:

This person is male, currently 55-years-of-age, high school education, same work background as Mr. Mascaro.  This first person, as I said, is currently 55, who can lift, carry, 20 pounds occasionally, 10 pounds frequently, can stand, walk, six out of eight, can sit six out of eight, frequent push, pull, laterally or below parallel to the ground . . . not overhead. . . . Frequent foot pedal.  This person can occasionally use a ramp or stairs, never a ladder, rope, or a scaffold, can frequently balance, occasionally stoop, kneel, crouch, and crawl.  This person cannot reach overhead bilaterally but can laterally, frequently. This person can constantly handle, finger, and feel. This person should avoid dangerous machinery and unprotected heights. . . .

(Tr. 88-89).  The VE testified that such an individual could perform work as a supervisor in landscaping or as an inspector hand packager or as an assembler, plastic hospital products.  (Tr. 89-90).

The ALJ described a second hypothetical worker:

Now, second hypothetical, this person is of the same education and work experience as the claimant.  This person can lift, carry 20 pounds occasionally, 10 pounds frequently. Standing and walking is now only four out of eight.  Sitting is six out of eight.  Frequent push, pull, and foot pedal, occasionally use a ramp or stairs, never on a ladder, rope, or a scaffold, can frequently balance, occasionally stoop, never kneel, occasionally crouch, never crawl, no reaching overhead but otherwise frequently, handling, fingering, and feeling is now only frequent, no limits on visual or communication skills.  This person should avoid a high concentrations of cold, wetness, and humidity, and must avoid entirely dangerous machinery and unprotected heights.  This person can do no complex tasks but can do simple routine tasks but that should be low stress and by that I mean no high production quotas, no pace rate work, no work involving arbitration and confrontation, negotiation, supervision, or commercial driving and finally, this person should have only superficial interpersonal interactions with the public. This is not to exclude contact, however, the contact that one has even though it may be frequent, overall, or with many people during the day, the time spent with each one should be of short duration, say five minutes and for purpose and that's it.

(Tr. 90-91).  The VE testified such a hypothetical worker could not perform any of the jobs that Plaintiff had performed in the past, but there were other jobs that such a worker could perform, such as inspector, assembler, and cashier.  (Tr. 91).

13

The third hypothetical was the same as the second, but the stand/walk limitation was two out of eight instead of four out of eight.  (Tr. 92).  The VE testified that the third hypothetical worker would be able to perform the job requirements of cashier, final assembler, and lens inserter.  (Tr. 92).

### III.  STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs*., 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work

14

activities." *Abbott*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).   Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and*  416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Plaintiff was insured on his/her alleged disability onset date, June 7, 2011, and remained insured through December 31, 2016.  (Tr. 313-320).  Therefore, in order to be entitled to DIB, Plaintiff must establish a continuous twelve month period of disability commencing between these dates.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.   SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2016.

2.  The claimant has not engaged in substantial gainful activity since June 7, 2011, the alleged onset date (20 CFR 404.1571 et seq. and 416.971 et seq.).

3. The claimant has the following severe impairments: osteoarthritis of the shoulders, fibromyalgia, hypertension and obesity (20 CFR 404.1520(c) and 416.920(c)).

15

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1(20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.   After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) with the following additional limitations: frequent pushing laterally and below, occasional climbing of ramps/stairs, stooping, kneeling, crouching and crawling, never climb ladders/ropes/scaffolds or reach overhead.

6.   The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.   The claimant was born on February 4, 1960 and was 51years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date. The claimant subsequently changed age category to advanced age (20 CFR 404.1563 and 416.963).

8.   The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.   The claimant has acquired work skills from past relevant work (20 CFR 404.1568 and 416.968).

10.  Considering the claimant's age, education, work experience and residual functional capacity, the claimant has acquired work skills from past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy (20 CFR 404.1569, 404.1569(a), 404.1568(d), 416.969, 416.969(a) and 416.968(d)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from June 7, 2011, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 33-43).

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy*, 594 F.3d at 512; *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of

choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White*, 572 F.3d at 281; *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

# VI.  ANALYSIS

**A.      First Assignment of Error: Whether the ALJ Failed to Assign the Appropriate Weight to the Opinion of Plaintiff's Treating Rheumatologist**

Plaintiff maintains that the ALJ did not properly weigh the opinion of Dr. Smith, Plaintiff's treating rheumatologist.  A treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Meece v. Barnhart*, 192 Fed. Appx. 456, 460 (6th Cir.2006); 20 C.F.R. § 404.1527(c)(2). However, "a finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected."  *Blakley v. Comm'r of Soc. Sec*., 581 F.3d 399 (6th Cir. 2009) (quoting Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9 at *9); *Meece*, 192 Fed. Appx. at 460 (Even if not entitled to controlling weight, the opinion of a treating physician is generally entitled to more weight than other medical opinions).  Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927."  *Blakley*, 581 F.3d at 408.[1]

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently

---

[1] Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers*, 486 F.3d at 242 (quoting Soc. Sec. Ruling 96-2p, 1996 SSR LEXIS 9 at * 5).  *See also Gayheart*, 710 F.3d at 376.  The purpose of this requirement is two-fold.  First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'"  *Id.* (quoting *Wilson*, 378 F.3d at 544).  Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule."  *Wilson*, 378 F.3d at 544.  Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record."  *Rogers*, 486 F.3d at 243.[2]

In the present case, the ALJ discussed the opinion of Dr. Smith as follows:

Treating rheumatologist, Howard Smith, M.D., completed a questionnaire on March 28, 2014 (Exhibit 16F).  Dr. Smith concluded that the claimant is not able to engage in substantial gainful activity.  He also concluded that the claimant is "severely" limited in sitting, standing, walking and lifting and "moderately" limited in activities of daily living and residual functionality.  Dr. Smith previously concluded that the claimant must change position from sitting to standing every 5-10 minutes (Exhibit 9F). Dr. Smith completed another questionnaire on February 5, 2015 (Exhibit 21F). Dr. Smith

[2]"On the other hand, opinions from nontreating and nonexamining sources are never assessed for 'controlling weight.'  The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling.  20 C.F.R. § 404.1527(c).  Other factors 'which tend to support or contradict the opinion' may be considered in assessing any type of medical opinion.  *Id.* § 404.1527(c)(6)."  *Gayheart*, 710 F.3d at 376.

20

concluded that the claimant is limited to lifting/carrying five pounds, standing/walking one hour total and sitting one hour total in an eight-hour workday.  He can rarely climb, balance, stoop, crouch, kneel, reach, push/pull and perform fine and gross manipulation.  He is restricted from heights, moving machinery, temperature extremes,  pulmonary irritants and noise.  Finally, there were no explanations for limitations unrelated to his treatment of the claimant, including those for pulmonary irritants and noise.

I give little weight to the conclusions of Dr. Smith as they are not supported by his own treatment records.  For example, the month following completion of the initial questionnaire, Dr. Smith noted in his treatment records that the claimant exhibited tenderness of the shoulder with decreased range of motion secondary to pain, but with no swelling, erythema or effusions (Exhibit 17F:4).  There was diffuse tenderness in the lumbosacral spine; however, his neurologic exam is grossly intact.  There was full range of motion of all other joints with no joint instability and muscle strength and tone was normal with no atrophy or abnormal movements.  These findings are consistent with other findings contained throughout Dr. Smith's treatment records, as outlined above.

(Tr. 40).

To summarize, it was the ALJ's reasoning that Dr. Smith's opinion is not supported by his own treatment records.  In reaching his conclusion, the ALJ acknowledged Dr. Smith's findings that Plaintiff "exhibited tenderness of the shoulder with decreased range of motion secondary to pain," and "diffuse tenderness in the lumbosacral spine."  Dr. Smith consistently and repeatedly reported such symptoms in his treatment notes over a period of years.  However, the ALJ suggested that because Dr. Smith also reported that Plaintiff had "no swelling, erythema or effusions" and that Plaintiff's neurologic exam was "grossly intact," Dr. Smith's opinion should be given less than controlling weight.  The rationale seems to be that the existence of a "grossly intact" neurologic exam together with an absence of swelling, erythema, and effusions calls into doubt Dr. Smith's opinion that Plaintiff suffered from severe physical limitations.

This reasoning does not survive scrutiny, and it does not comport with the treating physician rule.  The ALJ is not a medical expert, but he has substituted his own medical judgment for that of Dr. Smith.  When weighing medical expert opinions, an ALJ is required to

21

consider their quality and, thus, "should consider the qualifications of the experts, the opinions'
reasoning, their reliance on objectively determinable symptoms and established science, their
detail of analysis, and their freedom from irrelevant distractions and prejudices." *Underwood v.
Elkay Mining*, 105 F.3d 946, 951 (4th Cir.1997)).  However, as the Commissioner
acknowledges, an ALJ "may not substitute his own medical judgment for that of the treating
physician where the opinion of the treating physician is supported by the medical evidence."
*Meece*, 192 Fed.Appx. at 465.

For example, under Sixth Circuit case law, an ALJ impermissibly "plays doctor" when
he rejects a treating physician's opinion as "implausible" on the ground that "[i]t is
inconceivable that this claimant who has had pain due to pelvic adhesions with otherwise normal
examinations would be completely unable to move or do anything at all." *Simpson v. Comm'r of
Soc. Sec.*, 344 F. App'x 181, 194 (6th Cir. 2009).  Similarly, an ALJ plays doctor when he
discounts a treating physician's medical opinion because the treating physician prescribed
certain pain medications but not others that the ALJ believies would be more appropriate.
*Meece*, 192 Fed.Appx. at 465.

In this case, the ALJ did not properly weigh Dr. Smith's opinion with a view to the
quality of his opinion.  Dr. Smith concluded, as his treating physician, that Plaintiff suffered
from moderate to severe physical impairments.  The ALJ disagreed with this assessment, it
seems, because of the existence of the "grossly intact neurologic examination" and because of
the absence of shoulder "swelling, erythema, and effusions."  The ALJ provided no support for
the idea that this particular test result and the absence of these particular symptoms reasonably
undermine Dr. Smith's opinion.  There is nothing self-evident as to the medical significance this

evidence, and, except for the ALJ's conclusory assertion, the Commissioner has provided no reason to believe this evidence is inconsistent with Dr. Smith's opinion.  Neither the ALJ nor this Court has the medical expertise to conclude whether a grossly intact neurological exam or an absence of "erythema"  necessarily rules out the disabling condition to which Dr. Smith opined. As in *Meece*, the ALJ impermissibly substituted his own judgment for that of Dr. Smith.  Thus, the ALJ failed to properly explain and support with substantial evidence his decision to afford Dr. Smith's opinion less than controlling weight.[3]

Also in support of his conclusion that Dr. Smith's opinion deserved little weight, the ALJ cited evidence that "[t]here was full range of motion of all the other joints with no joint instability and muscle strength and tone was normal with no atrophy or abnormal movements." Although this evidence may come closer to supporting the ALJ's conclusion, he again failed "build an accurate and logical bridge between the evidence and the result."  *Fleischer*, 774 F. Supp. 2d at 877.  The ALJ simply cites the evidence without any explanation how this evidence reasonably undermines Dr. Harris's opinion.  As noted above, the purpose of the reason giving requirement is two-fold: it should provide both the claimant and the reviewing Court with a clear understanding why the ALJ decided as he did.  In this case, that purpose has not been fulfilled.

The Commissioner, in her brief on the merits, cites other evidence and makes a number of other arguments in relation to Plaintiff's treating physician Dr. Harris.  For instance, the Commissioner points out that Plaintiff's examination findings were "relatively minimal" as

---

[3]In his brief, Plaintiff argues extensively that the ALJ violated the treating physician rule. Although Plaintiff does not invoke the "good reasons" component of the rule specifically, the Court interprets the first assignment of error to include such a challenge.  Indeed, the Commissioner, in countering Plaintiff's arguments, asserts that the ALJ provided good reasons for awarding little weight to Dr. Smith's opinion.  (Doc. No. 13 at 10).

compared with Dr. Smith's assessment (Doc. No. 13 at 12); that Dr. Smith's assessment was inconsistent with the record as a whole (Doc. No. 13 at 12); and that Plaintiff's impairments were minimal and controlled with medication (Doc. No. 13 at 13), among others.

The Commissioner cannot cure a deficient opinion by offering explanations never offered by the ALJ.  As courts within this district have noted, "arguments [crafted by defense counsel] are of no consequence, as it is the opinion given by an administrative agency rather than counsel's 'post hoc rationale' that is under the Court's consideration."  *See, e.g., Blackburn v. Colvin*, 2013 WL 3967282 at * 8 (N.D. Ohio July 31, 2013); *Cashin v. Colvin*, 2013 WL 3791439 at * 6 (N.D. Ohio July 18, 2013); *Jaworski v. Astrue*, 2012 WL 253320 at * 5 (N.D. Ohio Jan. 26, 2012).  In this case, the various arguments now advanced by the Commissioner were not articulated by the ALJ in administrative proceedings.  Accordingly, this Court rejects the Commissioner's *post hoc* rationalizations.

**B.        Second Assignment of Error: The ALJ's Assessment of Plaintiff's Upper Extremity Limitations**

Plaintiff maintains that the ALJ erred by failing to properly incorporate his upper extremity restrictions into his RFC.  The particular restrictions include the abilities to "rarely reach, push, pull, and perform fine and gross manipulation."  (Tr. 669-670).  This Court has already concluded that the ALJ erred in failing to provide adequate reasons for having assigned less than controlling weight to Dr. Smith.  Since it is recommended that this matter be remanded for reevaluation of Dr. Smith's opinion, Plaintiff's RFC is subject to change.  As such, it is unnecessary for the Court to address Plaintiff's second assignment of error.

C.      **Third Assignment of Error: The ALJ's Finding that Plaintiff's Mental Disorder was Not Severe**

At step two of the sequential evaluation, an ALJ must determine whether a claimant has a "severe" impairment.  *See* 20 C.F.R. §§ 404.1520(a) (40(ii) & 416.920(a)(4)(ii).  To determine if a claimant has a severe impairment, the ALJ must find that an impairment, or combination of impairments, significantly limits the claimant's physical or mental ability to do "basic work activities."  *See* 20 C.F.R. § 416.920(c).  "An impairment ... is not severe if it does not significantly limit your physical or mental ability to do basic work activities."  20 C.F.R. §§ 404.1521(a) & 416.921(a).  Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs," and include: (1) physical functions such as standing, sitting, lifting, handling, etc.; (2) the ability to see, hear and speak; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and, (6) dealing with changes in a routine work setting.  20 C.F.R. §§ 404.1521(b) & 416.921(b).

The Sixth Circuit construes the step two severity regulation as a "*de minimis* hurdle." *Rogers*, 486 F.3d at 243 n. 2.  If an impairment has "more than a minimal effect" on the claimant's ability to do basic work activities, the ALJ must treat it as "severe."  SSR 96–3p, 1996 WL 374181 at *1 (July 2, 1996).  The *de minimis* hurdle is intended to "screen out totally groundless claims."  *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir.1985). *See also Anthony v. Astrue*, 2008 WL 508008 at * 5 (6th Cir. Feb. 22, 2008).  The Sixth Circuit has recognized that only in the exceptional case is a claim dismissed as "totally groundless." *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988).

25

In this case, the ALJ acknowledged evidence that Plaintiff had been diagnosed with and treated for anxiety and mood disorders; and that Plaintiff had been assigned a Global Assessment of Functioning (GAF) score of 51-60.  (Tr. 36).  The ALJ also acknowledged the opinion of Plaintiff's treating psychiatrist, Dr. Rock, who found that Plaintiff had numerous mental limitations, including that Plaintiff could rarely understand, remember, and carry out complex job instructions; rarely understand, remember and carry out detailed, but not complex job instructions; and occasionally understand, remember, and carry out simple job instructions.  (Tr. 36-37, 705).  As to making personal and social adjustment, Dr. Rock found that Plaintiff could occasionally maintain appearance; occasionally socialize, rarely behave in an emotionally stable manner; rarely related predictably in social situations; frequently manage funds/schedules; and constantly have the ability to leave his home on his own.  (Tr. 36-37, 705).

The ALJ gave Dr. Rock's opinion little weight, because Dr. Rock's conclusions were not supported by his treatment records.  In particular, the ALJ noted that Dr. Rock generally reported that Plaintiff had appropriate appearance, appropriate behavior, normal speech, intact and linear associations and appropriate insight and judgment.  (Tr. 36-37).  The ALJ also asserted that there was no evidence of limitation in the four broad functional areas set out in the disability regulations (paragraph B criteria): activities of daily living; social functioning; concentration persistence or pace; and repeated episodes of decompensation.  (Tr. 37).

The ALJ's decision that the Plaintiff's mental impairments did not meet the *de minimis* hurdle at step two is unsupported by substantial evidence.  The opinion of a treating source must be given "controlling weight" if it (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence

26

in [the] case record." *Meece,* 192 Fed.Appx at 460; 20 C.F.R. § 404.1527(c)(2).  When less than

controlling weight is assigned, the ALJ is required to provide good reasons  "that are

'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave

to the treating source's medical opinion and the reasons for that weight.'"  *Rogers*, 486 F.3d at

242.

        Here, Dr. Rock was the only expert to offer an opinion as to Plaintiff's mental

impairments, and his opinion was based on multiple treatment visits with Plaintiff.  Dr. Rock's

treatment notes show that Plaintiff was anxious, depressed, and irritable secondary to physical,

situational, and financial stressors.  As described above, supra Sec. II., Dr. Rock opined that

Plaintiff had numerous occupational, personal, and social impairments.  This is substantial

evidence that does in fact overcome the *de minimis* hurdle, as it shows Plaintiff's impairments

are not merely a "slight abnormality which has such a minimal effect on the individual that it

would not be expected to interfere with the individual's ability to work, irrespective of age,

education and work experience." *Farris*, 773 F.2d at 90.  Further, while there may be evidence to

support the opposite conclusion, i.e. that Plaintiff's mental impairments were not severe, the ALJ

fails to provide the requisite reasoning supported by citations to the record to show that Dr.

Rock's opinion should not be fully credited.  For instance, the ALJ asserted that Dr. Rock's

opinion is undermined by treatment notes showing Plaintiff had appropriate appearance,

appropriate behavior, normal speech, intact and linear associations, and appropriate insight and

judgment.  However, the ALJ provided no explanation as to how these observations undermine a

finding that Plaintiff's mental impairment was severe.

In certain instances, an error at step two may be harmless, but that is not the case here. When the ALJ considers all of a claimant's impairments in the remaining steps of the disability determination, the failure to find additional severe impairments at step two does "not constitute reversible error." *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987); *see also Nejat v. Comm'r of Soc. Sec.*, 2009 WL 4981686 at * 2 (6th Cir. 2009).  Thus, where a claimant clears the hurdle at step two (i.e. an ALJ finds that a claimant has established at least one severe impairment) and claimant's severe and non-severe impairments are considered at the remaining steps of the sequential analysis, "[t]he fact that some of [claimant's] impairments were not deemed to be severe at step two is ... legally irrelevant." *Anthony*, 2008 WL 508008 at * 5.

Plaintiff cleared the step-two hurdle since the ALJ determined that Plaintiff's other impairments (osteoarthritis, fibromyalgia, hypertension, and obesity) were severe.  However, the error that occurred with respect to the analysis of plaintiff's mental impairments was not harmless because it is not evident that the ALJ considered Plaintiff's mental impairments at step four, when he formulated Plaintiff's residual functional capacity.  If an ALJ makes a finding of severity as to just one impairment, the ALJ still "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"  SSR 96–8p, 1996 WL 374184, at *5 (July 2, 1996).  This is because "[w]hile a 'not severe' impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may--when considered with limitations or restrictions due to other impairments--be critical to the outcome of a claim." *Id*.  "For example, in combination with limitations imposed by an individual's other impairments, the limitations due to such a 'not severe' impairment may

28

prevent an individual from performing past relevant work or may narrow the range of other work

that the individual may still be able to do."  *Id*.  Thus, whether Plaintiff's mental impairments are

deemed severe or not severe on remand, the ALJ must consider those impairments when

generating Plaintiff's residual functional capacity at step four.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's

final decision be VACATED and this matter REMANDED for further proceedings.

        *s/Jonathan D. Greenberg*
        Jonathan D. Greenberg
        United States Magistrate Judge

Date:  December 1, 2016

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of
Court within fourteen (14) days after the party objecting has been served with a copy of
this Report and Recommendation.  28 U.S.C. § 636(b)(1).  Failure to file objections within
the specified time may waive the right to appeal the District Court's order.  *See United
States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g
denied*, 474 U.S. 1111 (1986).**